(No. 31129.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK GRISWOLD, Plaintiff in Error.

*Opinion filed March 22, 1950—Rehearing denied May 15, 1950.*

534

FRANK A. McDONNELL, and DARROW, SMITH & CAR-
LIN, both of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and
JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T.
GALLAGHER, RUDOLPH L. JANEGA, and EDMUND H. GRANT,
all of Chicago, of counsel,) for the People.

Mr. JUSTICE CRAMPTON delivered the opinion of the
court:

An indictment was returned by a Cook County grand
jury in September, 1947, wherein the plaintiff in error,
Frank Griswold, was charged with the crime of murder,
he having admittedly shot and killed his wife, Agnes.

Griswold, when tried before a jury, was represented by
counsel selected and paid by him. The defense of accident
or misadventure was interposed. The trial court allowed

the People to present an instruction embodying a manslaughter verdict, and the jury found defendant guilty of that offense. Written motions for a new trial and in arrest of judgment were overruled, and defendant was sentenced to the penitentiary for not less than four nor more than eight years.

The defendant is represented in this court by new counsel of his selection. Certain facts are undisputed: Defendant married Agnes in 1935, she then being the mother of four children by a previous marriage. Two children were born of the union. Beth, the eldest, was eleven when her mother was killed, and she is the only living eyewitness of that event other than defendant. Husband and wife were addicted more or less to the use of intoxicating beverages, and Agnes' proneness therefor with her habit of staying out to late hours was the cause of quarrels between them. Following the marriage, Agnes worked in taverns as a dice girl at different times before and after the defendant became a probationary policeman in March, 1946.

On August 31, 1947, defendant worked on the four to midnight shift and told Agnes he would be home on the morning of September 1. He was brought home shortly after midnight by friends, who waited while he changed from his uniform to civilian clothes. While home he endeavored, by phone, to contact Agnes at a tavern where she was working from nine o'clock P.M. to two o'clock A.M. as a dice girl. He was unsuccessful, and, after observing Beth and the baby were asleep, he left with his friends for drinks and relaxation. About three o'clock in the morning he phoned Agnes, and told her to go home and take care of the children.

Defendant drank about a half dozen glasses of beer prior to returning home about 4:15 in the morning. Beth and the baby were home, but Agnes was not. He finally went to sleep about 5:15 A.M. and awakened about six o'clock to find Agnes in the bed. He asked in what tavern

she had been after closing hours and she would not answer, although the question was asked many times. Agnes finally sat up, feet resting on the floor, but persisted in not answering the question. Defendant took his pistol out of the bureau drawer with his right hand and repeated the question; when Agnes saw the pistol, she called for Beth.

From here on there is a lack of harmony in the testimony, and consideration must be given to Beth's version of what followed. The defendant testified that Beth, clad in a slip, and not wearing a blouse or sun pants, immediately came into the bedroom, slipped in between them, and he brushed her away with his left hand as he was facing the bed. Agnes, he said, simultaneously stood on her feet and grabbed the gun; when she did so, he pulled back and it was discharged. Agnes sat back and then slumped back on the bed, her feet remaining on the floor. Beth, he said, was standing back of him when the gun was fired. Defendant said his purpose in exhibiting the gun to Agnes was merely to frighten her into telling in what tavern she had been and he had no intention whatever of shooting her. He testified that he did not threaten to kill Agnes, and that Beth did not say, "You won't shoot anybody," and that she did not say, or do, anything, other than throw herself around her mother. The defendant stated that during all his married life with Agnes he had never threatened to take her life.

Beth, when testifying on direct examination, said in substance: Her mother called to her in a regular tone of voice about six o'clock in the morning, and she entered the bedroom occupied by her father and mother. She could not remember whether her mother was standing up, sitting up, or lying on the bed, and she was not sure her father was standing up. She did state with certainty how each was dressed. Her father was asking her mother where she had been, and she did not think her mother said anything, although her father asked the question more than once.

She saw him obtain the gun from the dresser drawer and, while he held it in his hand, heard him tell her mother, "I will kill you." When her father made the threat, she said, "I jumped onto my mother," who was either lying down or sitting on the bed, knees bent, feet almost touching the floor, and she believed her mother's head was on the pillow. She put her hands on her mother's head and told her father, whom she believed was standing at the time, "You are not going to shoot anybody." The gun went off while it was close to her right side, the muzzle being right up against her mother's body. Her mother did not make any movement after the shot was fired, and the position of the body was not changed before the arrival of the police a few minutes after the shooting. Following the shooting, she put on a dress, and while doing so, noticed black marks on the right side of her body just above the hip, and those marks were not there before the shooting. She was taken to the police station, and there gave her version of the shooting to the police and the assistant's State's Attorney who afterwards represented the People at the trial. She also testified at the coroner's inquest.

On cross-examination Beth said in substance: She clothed herself that night in a two-piece pajama suit, the top piece buttoning in the front. She could not remember what position her mother was in on first entering the bed-room, and she had no idea as to the length of time she was in that room. Her father was standing when she first entered, but she was unable to say how close he was to her mother. She was positive her father obtained the gun from the dresser drawer after he had asked her mother where she had been. She then stated, that although the gun came from the dresser, she could not remember whether her father took it from the drawer.

She said she got the black mark on her body early that morning when the gun was fired past her. Before the shot was fired, her father was trying to get her out of the way;

but she threw herself over her mother so her body partially covered her mother and her hand was around the latter's head.

William O'Malley, a police officer, testified to reaching the scene of the shooting within fifteen minutes after it happened, and to seeing Beth walking up and down from the kitchen to the bedroom, dressed in panties and a little striped blouse. People's Exhibit 1, being a blouse, was exhibited to the witness, and he said it was the blouse he saw on Beth when he entered the apartment. He went into the bedroom and examined the body of Agnes, and found her head was on the edge of a pillow corner, her feet over the edge of the bed and the toes just about touching the floor.

Joseph Nicol, a firearms technician at the Crime Detection Laboratory of the Chicago Police Department, testified to examining People's Exhibit 1 on September 3. By microscopic examination, and the use of chemicals, he found powder residue on the lower right portion of the hem of the blouse immediately below the sleeve and about an inch and a half toward the front of the garment. He also made an examination of People's Exhibit 4, which was the slip worn by Agnes when shot. He examined the bullet perforation in the slip for the presence of powder residue, using the same tests he applied to People's Exhibit 1. He found such residue on the blouse was caused by the residue in the gases blowing out from the side of the revolver through the gap between the cylinder and the barrel, and the residue found on the slip came from the muzzle of the revolver. This witness was not cross-examined, and his testimony stands uncontradicted.

It is the theory of defendant he was either guilty of murder or was innocent, and that the verdict of manslaughter, under all the circumstances apparent of record, was contrary to the weight of the evidence.

To aid in establishing his theory to be a fact, the defendant asserts the trial court erred in admitting in evidence People's Exhibit 1, this being an upper garment belonging to Beth and referred to in the evidence as a blouse. This is based upon Beth having testified she donned a two-piece pajama suit when she went to bed on the evening of August 31, and was wearing a playsuit, consisting of the blouse and panties, when she was in the bedroom with her parents the next morning. He argues the playsuit must have been put on by Beth subsequent to the shooting. The evidence does not sustain the argument. Beth was wearing the playsuit in the parents' bedroom, for how else could the blouse contain the residue of burnt powder that police technician Nicol testified it contained? This residue was on the portion of the blouse which covered the area of the black mark on her side. Her testimony of having such a mark is substantiated by the testimony of a police matron. The defendant immediately notified the police, by phone, of his act. O'Malley was cruising in his squad car in the vicinity, got a radio call at 6:29 A.M., and was in the defendant's apartment within a minute and a half; this was, according to the testimony of the defendant, within the ten minutes immediately following the shooting. O'Malley found Beth dressed in the playsuit, and when she did dress to accompany him to the station, she put on a blue corduroy dress. All the evidentiary circumstances, pro and con, on this point, when analyzed, lead only to the conclusion that Beth was wearing the blouse of the playsuit when she interposed her body in an endeavor to protect her mother. No error was committed in allowing the blouse in evidence.

Robert Soden is a step-son-in-law of the defendant, and lived with him in May, 1946. Soden testified that on a night in that month, Agnes called him into a bedroom and told him in the presence of the defendant that the latter

had put his revolver to her head. Soden said the defendant was holding the revolver when he entered the room. The defendant testified about this incident on his direct examination. He had placed the revolver on the dresser, and it was loaded, for a prowler had been around the premises. Agnes had just come home, and he had taken her into the bedroom and told her to go to bed. He picked up the revolver with the intent to place it in the dresser drawer. When Agnes saw the revolver in his hand, she screamed, and Soden entered the room. He said that she told Soden that he, the defendant, had put the gun against her head. When testifying, the defendant denied the act, but he did not testify that he had made a denial thereof to Soden following the accusation of Agnes.

The defendant charges error in the admission of the testimony of Soden in evidence on the ground the occurrence was too remote in time from the killing of Agnes. In *Parsons* v. *People,* 218 Ill. 386, the husband killed his wife in 1903, and this court approved allowing the People to show the fact of quarrels between them, and ill-treatment of the wife by the husband in 1900. In *Painter* v. *People,* 147 Ill. 444, the defendant killed his wife in May, 1891, and it was held the People rightfully proved prior quarreling between them, and an assault by him upon the wife a year before. The incident was not too remote in time. It is also contended this testimony of Soden did not prove the May assault beyond a reasonable doubt, when it is considered alongside the defendant's version of what happened at the time. This objection only goes to the credibility of the two. The determination of the credibility of witnesses is a prerogative of the jury and not of a court of review.

A few hours after the shooting, the defendant was questioned by the assistant State's Attorney, who subsequently represented the People at the trial. The questioning was done in the presence and hearing of officer O'Malley, other

police officers, and a court reporter. On the conclusion of the questioning, the defendant was taken from the room. The assistant, in the presence and hearing of O'Malley and using notes made during the questioning, dictated to the reporter a memorandum of what defendant had said. O'Malley was called as a rebuttal witness and, for the purpose of refreshing his recollection, read the memorandum prior to going on the witness stand. He testified the defendant had told them he had quarreled with Agnes in the bedroom, pulled a service revolver on her, threatened her with it, and she had called for Soden. He came into the bedroom but did not take the gun away from him. There was no cross-examination of O'Malley on rebuttal. Objections were made in the lower court to allowing this testimony to go in evidence, and all were overruled.

The defendant contends this testimony of O'Malley on rebuttal was not competent. The reasons advanced in support of this contention are unconvincing; for when an accused makes statements or declarations before or after the commission of the crime, and they do not amount to a confession, such, when taken in connection with other evidence of surrounding circumstances, allow an inference of guilt, and as a consequence, are admissible in evidence as admissions. (16 C.J., Criminal Law, sec. 1243.) A statement of an accused, made out of court to the police at the time of arrest, and which is an admission tending to show his guilt, is not a confession, and can be given in evidence in rebuttal of the accused's contrary statement on the witness stand, in order to corroborate the testimony of a witness for the People. (*People* v. *Fionda,* 286 Ill. 19.) The rule in this State permits a witness to testify only to facts within his knowledge and recollection. He is allowed to refresh and assist his memory by the use of a written instrument, memorandum, or entry in a book. The writing need not be made by the witness himself, and it need not be an original writing; he need only inspect what is re-

corded, so he can speak to the facts from his own recollection. (*People* v. *Krauser,* 315 Ill. 485.) O'Malley's rebuttal testimony was founded upon his independent recollection of events, after he had refreshed his memory by reading the memorandum. He testified over four months after the shooting, and it would be practically asking the impossible for a police officer or any other person, performing a great variety of daily tasks, to retain specific recollection of every phase of the questions put to the defendant and his answers thereto. The refreshing of the recollection from the dictated memorandum of what was said, merely operated to unlock the doors of O'Malley's memory, wherein he had filed his first-hand knowledge of what had been done and said when the defendant was questioned in his presence and hearing. The court did not err in admitting this testimony.

The defendant believes the evidence is such that it allows only one of two conclusions,—either he is guilty of murder, or he is innocent under the defense interposed,—and the giving of the instructions pertaining to manslaughter was reversible error. The giving of the manslaughter instructions was warranted by the evidence. In view of the evidence that defendant and Agnes had lived together for about twelve years under the continually prevailing fact of her activities as a dice girl and frequenter of taverns, coupled with the consequent frequent disagreements arising therefrom, the jury may well have deemed the evidence established beyond all doubt that defendant killed Agnes while in the heat of a sudden passion he could not control, and which was devoid of malice that is a necessary element of the crime of murder. The evidence in the case was conflicting and the outcome depended upon the evaluation of the credibility of the witnesses by the jury. Under those circumstances, we regard the verdict of the jury as conclusive, especially when approved by the trial judge, and we will not interfere unless some fact or circumstance appears

in the evidence from which we can say that some witnesses have been truthful and worthy of credit, while others have been untruthful or mistaken. (*People* v. *Colvin,* 294 Ill. 196.) The verdict must be founded on evidence which is improbable, unsatisfactory, or reasonably doubtful, before we will refuse to sustain it. (*People* v. *Binger,* 289 Ill. 582.) The evidence is not improbable, unsatisfactory, or reasonably doubtful. The evidence of good character introduced on behalf of defendant could have operated to cause the jury to believe the defendant killed without malice just as well as it could have operated to cause the jury to believe the killing was the result of accident or misadventure. In the last analysis, the defendant by this writ simply desires the court to substitute its judgment for that of the jury in weighing the credibility of the witnesses when the testimony is conflicting.

The record is free of error prejudicial to the defendant, and the judgment of the criminal court of Cook County must be affirmed.                *Judgment affirmed.*