(No. 33964.—■■■■■■■■)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY LION, Plaintiff in Error.

*Opinion filed January 24, 1957.*

CHARLES A. BELLOWS, and JASON ERNEST BELLOWS, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and WILLIAM L. CARLIN, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

As a result of the slaying of one Florence Lavora in a Chicago tavern during the morning of December 22, 1951, Henry Lion, hereinafter referred to as defendant, was indicted for murder, and at the jury trial which followed in the criminal court of Cook County, a verdict was returned finding him guilty of the crime charged and fixing his punishment at life imprisonment. From the judgment and sentence thereon, the writ of error was prosecuted.

The record discloses that although the deceased was a married woman, she and the defendant were quite friendly and had been in the habit of frequenting neighborhood taverns together since 1946. Lion, a retired police officer, was also married during the first few years of this acquaintance, but separated from his wife in 1950. Thereafter, he continued to visit the deceased at her home, often giving her money and presents, and enjoyed an amicable relationship with both her father and her husband. After finishing

work on the evening of December 21, 1951, defendant stopped at the decedent's residence at about 5:30 P.M., and after talking with Mrs. Lavora and her husband for a few minutes, proceeded to a tavern located at 2604 South Kedzie Avenue in Chicago. At approximately 7 P.M. of the same evening, the decedent entered the tavern and joined defendant at the bar. The couple continued to drink together until shortly before 2 A.M., at which time the defendant left and the tavern was closed. Mrs. Lavora and some other customers remained in the tavern, however, and at about 3:30 A.M., defendant returned and knocked on the front door for admittance, whereupon Mrs. Lavora went to the door and opened it. At that point, a struggle took place between Mrs. Lavora and the defendant which resulted in her being fatally shot by the defendant's service revolver. A few minutes later the police arrived and defendant was thereafter taken, first to the Bridewell Hospital, and then to the State's Attorney's office for questioning.

The only real disputes as to the facts of this case are concerned with prior threats allegedly made by defendant against the decedent and with the details of the shooting itself. Gloria Ackermann, a sister of the deceased, testified that in May, 1951, she was listening to a heated argument between defendant and Florence Lavora when she heard her sister scream "Hank, put that gun down. What are you doing, you crazy fool? Dawnie, Dawnie, come here, look what Henry is trying to do to your Mommie." This witness explained that Dawnie was the decedent's eight-year-old daughter.

Another sister, Ruth Notarus, testified that Florence was visiting her in the Notarus home in July, 1951, when the defendant came to the door and demanded that Florence leave with him. According to this witness, Florence not only refused to go, but also told him that she was through with him and did not want to see him again,

whereupon defendant drew a gun and fired two shots in Florence's direction. This witness also told of another instance in which defendant attempted to shoot the decedent because she would not accompany him.

As to the slaying itself, Erwin Smrt, the tavern owner, described how he arrived at his place of business at about 10 P.M. and noticed defendant and Mrs. Lavora sitting together at the bar. Thereafter, during the course of the evening, Smrt served them each drinks and observed defendant leaving the tavern on several occasions, but stated that he at no time noticed anything unusual about the defendant's speech, walk, or physical condition. According to Smrt, defendant left the tavern for the last time at approximately 1:30 A.M., and about 2 A.M. the tavern doors were locked for the night, at which time there were several customers, including the decedent, still in the premises. At about 3:30 A.M., continued Smrt, he heard a knock at the front door and observed Mrs. Lavora walk to the door and admit the defendant. As the latter stepped inside, he pulled a shiny object from his right coat pocket and said: "You had this coming for some time; you asked for it." The decedent grabbed the defendant, shots were fired, and both fell to the floor.

Marie Smrt, the tavern owner's wife, testified that she was also in the tavern during the evening in question and was seated some seven feet from defendant and Florence Lavora, but did not overhear any argument or loud talk between them nor observe anything unusual in the defendant's walk or physical condition. According to this witness, at about 3:30 A.M. Florence Lavora was putting on her coat in preparation to leave when she suddenly placed the coat on a table and walked towards the front. The witness observed at this time that the decedent's gloves, purse, and boots were also on the table. As Florence Lavora opened the door, defendant walked in and the struggle and shooting commenced immediately.

This testimony was substantiated, at least in part, by the other customers who were in the tavern at the time of the shooting. Morris Ginsberg stated that at about 3:30 A.M. he heard a knock at the door and the subsequent firing. Henry Gerzan testified that when Florence Lavora opened the door, the defendant walked in and the struggle followed.

Gerald Brown, a police officer, described how he discovered the gun at the scene of the shooting and found Florence Lavora and defendant lying side by side upon the floor. Another police officer, Roy Loavis, testified that when defendant was questioned at the tavern, he stuttered and hesitated when he spoke and had a strong odor of liquor upon his breath. Miles Brouk, a third policeman, confirmed that there was an alcoholic odor on defendant's breath and that he "stuttered and fumbled for words." This officer also identified two statements which had been made by defendant on the day of the shooting and which were introduced into evidence as People's exhibits 6 and 7. In the latter exhibit, defendant stated that on the evening in question, Florence had his service revolver in her possession; that he had given the gun to her because he didn't want it near him; that she was picking on him at the tavern; that she then threatened to kill him, and that he thereafter blacked-out from a heart attack and did not regain his senses until he awoke in the hospital. People's exhibit 6, however, set forth statements to the effect that defendant gave his revolver to Florence because she was afraid of prowlers; that on the morning in question she threatened to kill him with the gun; that he then left the tavern and tried to get a cab but was unsuccessful; that he got cold, walked back to the tavern, and told Florence his heart was bothering him, and that then his black-out occurred.

In the testimony given in his own defense, defendant admitted that People's exhibits 6 and 7 were true but denied

that he had ever threatened the decedent or had any motive or intention to harm her. According to his account, he met Florence in the tavern at about 7 P.M. and they drank together during the evening of December 21. Although he drank nothing but beer, he became nauseated and left the tavern on several occasions for coffee and fresh air, returning the last time just prior to the shooting. Even though he described his condition as "drunk and intoxicated," he did recall that as he stepped into the tavern on the last occasion, Florence was standing in front of him with a gun in her hand. The defendant said he grabbed for the gun, heard one shot, and then passed out.

In rebuttal, the State was allowed to introduce the testimony of Ruth Lera, a niece of the deceased, who described how her aunt, while partially dressed, had come to the witness' apartment on November 18, 1951, to avoid the defendant, how defendant followed her to the house, and how the police were called in order to remove him. On this occasion, she stated, defendant threatened to kill Florence if she pressed charges against him.

As grounds for reversal of his conviction, defendant now contends: (1) that he was so intoxicated at the time of the shooting he could not have had the malice necessary for the crime of murder; (2) that the decedent's death was the result of an accident; (3) that prejudicial remarks were made by the prosecuting attorney, and (4) that the trial court erred both in admitting evidence of prior threats, and in restricting defendant's cross-examination.

It is the rule in this State that voluntary drunkenness is no excuse for the perpetration of a criminal act, (Ill. Rev. Stat. 1955, chap. 38, par. 599; *People* v. *Klemann*, 383 Ill. 236,) and that it may be used to negative the essential elements of intent and malice only where the intoxication is so extreme as to entirely suspend the power of reason. (*People* v. *Minzer*, 358 Ill. 345; *People* v.

*Cochran*, 313 Ill. 508; *People* v. *Brislane*, 295 Ill. 241; 21 I.L.P. Homicide, sec. 17.) Merely being "drunk" or "intoxicated" is no defense, even though the condition may have lasted for several days. (*People* v. *Kadlecek*, 391 Ill. 470.) Here, defendant worked until 4 P.M. of the day in question and commenced drinking sometime prior to 7 P.M., the time that the decedent entered the tavern. Thereafter, he drank only beer, leaving the premises on at last three occasions for either coffee or fresh air. Although his movements were observed by both Erwin and Marie Smrt, neither noticed anything unusual about the defendant's speech, walk, or physical condition. Indeed the defendant himself admitted that he remembers leaving the tavern at about 9 P.M. for five or ten minutes; he remembers leaving a second time for a cup of coffee and returning around 11:30 P.M.; he also recalls that the decedent had over 20 drinks of whiskey before midnight; that she started picking on him about 2 A.M.; that when he returned to the tavern for the last time, Florence was standing at the door with a gun in her hand, and that he grabbed for the gun and heard one shot fired. On the other hand, the only evidence of intoxication was the defendant's own statements to this effect and the police officers' testimony that his speech was marked by stuttering and hesitancy immediately following the crime. Such facts appear to vitiate any theory that defendant's intoxication was so extreme as to render him incapable of having the malice and intent necessary to the crime of murder.

Nor do we believe that, as a matter of law, this slaying must be held to have resulted from a mere misadventure. We have consistently said that a verdict in a criminal case will be set aside on review only where the evidence is so improbable as to raise a reasonable doubt as to the defendant's guilt. (*People* v. *Quevreaux*, 407 Ill. 176; *People* v. *Fisher*, 303 Ill. 594; *People* v. *Allen*, 413 Ill. 69.) In

this case there was competent evidence to support a finding of guilt, whereas there was little, if any, evidence to indicate death by accidental means. Even the defendant testified that he blacked out and did not know how the slaying occurred. Since the jury observed the witnesses and was in a much better position to evaluate their testimony than is a court of review, its verdict will not now be disturbed. *People* v. *Kirkendoll,* 415 Ill. 404; *People* v. *Bucnis,* 405 Ill. 568; *People* v. *Jarecki,* 291 Ill. 80.

Next, the defendant contends he was deprived of a fair and impartial trial by reason of certain remarks which were made by the prosecuting attorney. In commenting upon character testimony which was given for the defense, the assistant State's Attorney stated that "Alger Hiss, the convicted communist, had some perfect testimonials." In response to defense objections, this comment was immediately stricken by the court and, at the close of the trial, the jury was instructed to wholly disregard any statements of counsel which the court afterwards struck out. In view of this, we are of the opinion that the remark, although perhaps improper, was not so prejudicial as to constitute reversible error. Also, the defendant points out that the prosecuting attorney made certain remarks concerning crimes that go unpunished and commented upon the fact that defendant had not seen fit to call the hospital attendants to testify as to his state of inebriation. This court has had occasion to consider similar objections in *People* v. *Sicks,* 299 Ill. 282, *People* v. *Tanthorey,* 404 Ill. 520, and *Siebert* v. *People,* 143 Ill. 571, and in each instance they were held to be without merit. The decisions delivered in the cited cases make it unnecessary to further elaborate upon these points. It is our opinion that the defendant was not, in this instance, deprived of a fair and impartial trial.

Finally, defendant contends that the lower court erred

both in admitting evidence of prior threats and in restricting certain cross-examination. During the course of the trial, Gloria Ackermann and Ruth Notarus testified as to threats by the accused against the decedent. While testifying upon his own behalf, defendant denied that such threats were ever made, but, to the contrary, stated that he and Florence were the best of friends and described the many kind things that he had done for her. However, in rebuttal for the People, Ruth Lera recalled that such a threat had occurred on November 18, 1951. Threats made by an accused against the deceased prior to the commission of the criminal act are admissible in evidence as evidencing malice and the criminal intent. (*People* v. *Griswold,* 405 Ill. 533; *People* v. *Dabney,* 315 Ill. 320; *People* v. *Scott,* 284 Ill. 465; *Painter* v. *People,* 147 Ill. 444; 21 I.L.P., Homicide, sec. 102.) Although testimony that would be proper as evidence in chief should not be reserved for rebuttal, these matters rest largely within the discretion of the trial court and such rulings will ordinarily not be set aside upon review. (*People* v. *Crump,* 5 Ill.2d 251; *People* v. *Bell,* 328 Ill. 446; *People* v. *Drysch,* 311 Ill. 342; *Upstone* v. *People,* 109 Ill. 169.) In fact, in *People* v. *Curtright,* 258 Ill. 430, this court expressly held that where the defendant offers evidence that he treated the victim kindly at all times prior to the attack, it is competent for the People to prove otherwise in rebuttal. The testimony in the present case was properly received in evidence.

As to the restriction of cross-examination, defendant points out that while questioning the prosecution's witness, officer Miles Brouk, the defense attorney was prevented not only from interrogating about complaints of prowlers being in the decedent's neighborhood, but was also prevented from examining the witness concerning a tear-gas gun allegedly found in the victim's purse following the shooting. Whether or not a complaint was lodged with

the local police or whether the decedent's purse contained a tear-gas gun were certainly not germane to the issues at hand, especially in view of the fact that Marie Smrt had already testified that decedent did not have the purse with her at the time of the shooting but that it was located on a table towards the rear of the tavern. Since Brouk made no mention of these matters during his direct examination, and since such information had little, if any, probative value, it is our opinion that such questions were immaterial and beyond the scope of cross-examination. Thus, it cannot be said that the lower court erred in this regard.

For the reasons stated, the judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*