(No. 52676.— )

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MONROE LAMPKIN, Appellant.

*Opinion filed November 10, 1983.—Rehearing denied December 9, 1983.*

RYAN, C.J., and UNDERWOOD and MORAN, JJ., dissenting.

Tyrone C. Fahner and Neil F. Hartigan, Attorneys General, of Springfield (Melbourne A. Noel, Jr., Michael A. Ficaro, Mark L. Rotert, and Faith S. Salsburg, Assistant Attorneys General, all of Chicago, of counsel), for the People.

Sam Adam, of Chicago, for appellant.

JUSTICE CLARK delivered the opinion of the court:

Monroe Lampkin was indicted in the circuit court of Ford County for the murders of Michael McCarter and Donald Vice under section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and the murder of William Caisse under sections 9—1 and 5—2(c) of the Code (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1, 5—2(c)) by accountability. Prior to trial, defendant's request for a change of place of trial (Ill. Rev. Stat. 1977, ch. 38, par. 114—6) was granted and defendant was tried before a jury in Kankakee County. At the conclusion of the trial, the jury returned verdicts of guilty on all three counts of murder. The State requested a hearing to determine whether the death penalty should be imposed. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) Defendant exercised his right to have the determination made by the jury. The jury found unanimously, beyond a reasonable doubt, that the defendant, Monroe Lampkin, murdered an individual known to the defendant to be a peace officer in the performance of his official duties (Michael McCarter), as well as two other individuals, both of which are aggravating factors supporting the imposition of the death penalty. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b).) The jury unanimously found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1977, ch. 38, par.

9—1(g).) The trial judge entered judgment sentencing the defendant to death. The jury that convicted the defendant was the same jury that found there were no mitigating factors sufficient to preclude the sentence of death. Thus, all of the evidence introduced at trial was heard by the jury that sat at the death sentencing hearing. The death sentence was stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court, pursuant to Rule 603 (73 Ill. 2d R. 603).

On the evening of April 7, 1979, four brothers, Monroe, Cleveland, David and Clyde Lampkin, were traveling southbound on Interstate Highway 57 near Paxton. Monroe and Cleveland were traveling in a red and silver Ford Thunderbird; David and Clyde in a red camper-type pickup truck. The two vehicles carrying the Lampkins came upon a van driven by Melvin and Phyllis Lynch and a blue Buick driven by Eartis Farrell, carrying Jackie Townsend and their infant son. These four vehicles were traveling south on Interstate Highway 57. Illinois State Trooper Michael McCarter was patrolling the southbound lanes in State of Illinois Car No. 659, an unmarked vehicle. Accompanying McCarter was Donald Vice, his brother-in-law, a civilian.

McCarter began traveling with the convoy of the four vehicles and, after a radar speed check, radioed Iroquois County Deputy Sheriff Gary Weisenbarn requesting assistance in stopping the convoy. William Caisse and Larry Hale, both officers of the Paxton police department, responded. Caisse entered the southbound lanes of Interstate Highway 57, but Hale remained on the Route 9 overpass to stop a motorcyclist and issue him a citation.

McCarter stopped the van and Buick while instructing Caisse to stop the Thunderbird and pickup. The pickup pulled over but not the Thunderbird. Caisse remained with the three stopped vehicles on Interstate 57 at the Route 9 overpass, while McCarter pursued the Thunderbird. Monroe and Cleveland pulled to the shoulder a mile and a quarter farther south, just south of the Route 17 overpass.

Trooper McCarter stopped approximately five feet behind the Thunderbird. McCarter ordered Monroe and Cleveland out of their car. Shortly before 9 p.m., Ronald Wallace, a passing motorist, saw the stopped vehicles. Trooper McCarter and two individuals were standing between the vehicles talking. Just after 9 p.m., McCarter radioed Caisse and requested that he bring the other three vehicles to his position and that Caisse "come down here and back me up. I got a subject giving me a hard time." A few seconds later, McCarter again radioed Caisse to "[b]ring those vehicles here to where I'm at right here ***. This subject down here is giving me a hard time." One and one-half minutes later McCarter radioed "I'm shot, I'm shot."

At approximately 9 p.m., Don Kutz was traveling southbound on Interstate Highway 57. Kutz observed Caisse's car and the vehicles stopped at the Route 9 overpass and the two vehicles stopped at the Route 17 overpass. Kutz "observed three, approximately three flashes of lights and I heard three at least three sounds." They were coming from between the two vehicles. Kutz saw a man crouched at the left rear corner of car 659 and two men just north of the Thunderbird. The flashes coming from between the vehicles were pointed north.

An autopsy showed McCarter had been shot on the right side of the neck, left upper chest and left upper thigh. Dr. Yve T. Ho, who performed the autopsy, opined that the bullet wound to the neck would have been sufficient to cause McCarter's death. Vice had been shot twice. Krail Lattig, a forensic scientist and firearms expert employed by the Illinois Bureau of Scientific Services, established that the bullets recovered from the body of Donald Vice and a bullet recovered from the clothing of McCarter were all fired by the same .38-caliber weapon. None of the weapons recovered at the scene were found to have fired these bullets. Spent casings, as well as live .38-caliber cartridges, were also recovered from the grassy area west of

I-57 at the Route 17 overpass south of Route 17; however, no .38-caliber pistol was ever recovered. McCarter shot Cleveland, who later died of the wound, and also shot defendant in the left wrist, wounding him.

Obert and Barbara Litteral were traveling north on Interstate Highway 57 at approximately 9 p.m. when Mr. Litteral observed an individual running northbound on I-57. The individual jumped over the guardrail at the Route 17 overpass in a westerly direction, went behind the pillar of the overpass and then ran south. The individual wore a brownish vinyl-type jacket. Litteral observed a second individual, McCarter, who ran north along I-57 and stopped at the pillar. Litteral observed that McCarter had a weapon in his right hand, appeared to be wounded, and "[i]t looked like the gun was pointed around the pillar." Barbara Litteral also observed the individual in the brown jacket. The Litterals both identified the jacket they saw that night as similar to that which defendant admitted wearing on the night in question and which was in evidence.

It appears that Officer Caisse and the other three vehicles arrived on the scene while the events last mentioned were happening or immediately thereafter. Mr. Lynch (who was in the van) heard gunfire and saw McCarter firing his weapon in a westerly direction up the embankment towards the Route 17 overpass. Caisse then assisted McCarter to his, Caisse's, squad car and placed him in the passenger seat. David and Clyde then got out of the pickup but were ordered back to it by Caisse. Officer Hale, who had been detained while giving a citation to a motorcyclist at the Route 9 overpass, then arrived and fired a few shots in a westerly direction towards the embankment, as he had heard shots and saw muzzle flashes from this area. Hale then went to Caisse's vehicle, removed a shotgun from the trunk and gave it to Caisse. Hale returned to his own vehicle to call for more help and to get additional equipment, and Caisse returned to a position near the overpass facing

southwest. David Lampkin then got out of the pickup truck again, put on a brown leather jacket and obtained a rifle from the back of the truck. David shot Caisse in the back, killing him, and then shot Vice and McCarter. David fired at Hale, wounding him; however, Hale returned the fire, killing David on the spot.

Clyde Lampkin was found standing next to the body of David. Trooper Michael McCarter, Officer William Caisse, Donald Vice, David Lampkin and Cleveland Lampkin all died as a result of these events. Officer Larry Hale was wounded but recovered. Defendant was found and arrested 26 hours later, north of Paxton.

As noted above, the jury found the defendant guilty on all three counts of murder, and he was sentenced to death.

After notice of appeal was filed, certain facts became known to defendant's counsel which were *dehors* the record on appeal. Defendant's counsel felt that this necessitated an evidentiary hearing and filed a combined petition in the trial court seeking post-conviction relief (Ill. Rev. Stat. 1977, ch. 38, par. 122—1 *et seq.*) and relief from judgment under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 72). The proceedings before this court were stayed pending disposition of the combined post-conviction and section 72 petition.

Defendant alleged in his combined post-conviction and section 72 petitions three general areas of constitutional deprivation: suppression of evidence by the prosecution; knowing misrepresentation by the prosecution to the jury; incompetency of defendant's trial counsel resulting from the failure of the trial court to grant sufficient time for trial preparation; and/or a conflict of interest resulting from trial counsel's representation of both defendant and defendant's brother, Clyde Lampkin.

The relief sought was denied, and we now consider the combined appeal from the sentence of death and denial of the post-conviction relief.

We first address the defendant's contention that the court erroneously permitted the prosecution to introduce evidence at trial of a statement made by defendant almost six years prior to the incident in question. In June of 1973, Officer Harold Kunz, on an investigation for the Chicago police department, had occasion to question defendant in connection with an auto theft. Kunz testified at trial that the defendant stated, "You white honky coppers are [expletive deleted] with us now, and we will get you later." The defendant claims the prejudicial nature of this testimony has denied him a fair trial. We agree.

Defense counsel strenuously objected to the testimony from the time Officer Kunz was added to the People's list of witnesses on August 31, 1979. Defense counsel filed a motion *in limine* seeking "an order barring the use of a statement purportedly made by Defendant, Monroe Lampkin, on June 19, 1973."

The court conducted a hearing on the motion *in limine* and at the hearing Kunz testified that on June 19, 1973, he was employed as a Chicago police officer assigned to Area 3 Auto Theft. He said that on that day he had seen the defendant Monroe Lampkin, who had been arrested at 7226 South Morgan, Chicago, in connection with a stripped automobile. Kunz testified he saw Monroe Lampkin at the police station in the company of Cleveland Lampkin and Paul Lampkin, at which time Kunz interviewed Monroe Lampkin, and the defendant made the statement that "You white honky coppers are [expletive deleted] with us now, and we will get you later."

In denying the motion *in limine* the trial court mistakenly relied upon the case of *People v. Scott* (1918), 284 Ill. 465, as authority for finding that the evidence should not be excluded.

The State asserts that because the comment indicates a hostile purpose on the part of the speaker, and the deceased is encompassed within the scope of the threat

against "white honky coppers," that *Scott* provides authority that such a statement is admissible. We disagree. The remark admitted into evidence in *Scott* was made two days prior to the killing in that case and spelled out a specific time and location. In *Scott* the court also said that a "threat by the accused to kill or injure a person other than the deceased, or a mere idle threat of a general nature not directed to any particular person, is not admissible to show malice towards the deceased." 284 Ill. 465, 474-75.

This evidence was not only wrongfully introduced into evidence at trial, it was emphasized in the prosecutor's opening statement and highlighted in the prosecutor's closing argument. It is apparent that the prosecuting attorney wanted to leave no doubt in the jury's mind that the alleged remarks constituted a direct threat that was purposefully and intentionally acted upon. The prosecutor's statements were inflammatory, prejudicial and groundless.

In his opening statement the prosecutor described what he expected the forthcoming evidence to show and stated:

> "This is the same man, ladies and gentlemen, who the evidence will show in the past communicated a threat to a Chicago police officer that he was going to get even with the white police."

At trial the prosecution waited until near the close of its case in chief to call Officer Kunz to the stand. The defendant argues that this was done to place greater emphasis on the officer's testimony.

On cross-examination, Officer Kunz acknowledged that he did not report the alleged threat to his supervisor but he indicated that he independently remembered the events of that day in June of 1973. On redirect examination, the State's Attorney asked if Officer Kunz had some explanation as to why six years later he was able to independently recall what happened. Officer Kunz responded that he did have an explanation, and when asked what it was he responded that "We, we have been threatened many times, but this one stuck out in my mind. *It was apparently a*

*threat that was carried out—*" (Emphasis added.) Defense counsel's vehement objection to this testimony was overruled.

During the People's closing argument the prosecutor drove home Kunz' theme that the defendant had carried out his threat. Later in the prosecutor's summation, the State's Attorney again drew attention to the alleged threat in responding to the argument of defense counsel that the defendant had no weapon, or any need for a weapon. The prosecutor said:

"Well, I am sure that you will recall the testimony of police officer Kunz, and the circumstances under which the defendant here told him, *'You are messing with us now, but we will get you white honky coppers later.'* I *think that it is a fair inference from the evidence that Monroe Lampkin did indeed have a need for weapons.*" (Emphasis added.)

Moments later the prosecutor again dramatized the significance of Officer Kunz' testimony:

"You are next told that there really was no purpose in asking police officer Harold Kunz to testify in this case. That it was done to give you, ladies and gentlemen, the impression that the defendant had a grudge against the police. *Well, you will have to draw your own conclusions from that officer's testimony, but I think it graphically demonstrates that this defendant certainly had a predisposition to kill police officers.*" (Emphasis added.)

It was not brought out in the opening or closing remarks that the defendant's comment was made in a setting totally unrelated to the instant cause in any manner whatsoever and was made *six years earlier* to a police officer who had nothing to do with this case. No report of the alleged threat was ever made, but rather the officer's testimony was based entirely upon his independent recollection of what had happened on that day six years ago.

To understand the prejudicial impact of Officer Kunz' testimony we need only look at the context in which the prosecutor's account of the alleged threat was being told.

A black defendant was being charged with killing three white men, two of them police officers. The evidence against the defendant was entirely circumstantial, and the prosecutor was describing to an all-white jury an alleged threat made by this black defendant to a white policeman.

We note that while the statement about the "white honky coppers" was not introduced at the sentencing hearing, the jury impaneled for the sentencing hearing was the same as the trial jury. Therefore, the jury that found no mitigating factors to preclude the sentence of death heard all of Officer Kunz' testimony at trial.

The State argues that the statements of the defendant are admissible as evidence of malice or criminal intent. For support, the State cites *People v. Lion* (1957), 10 Ill. 2d 208, and *People v. Jayne* (1977), 52 Ill. App. 3d 990, which held that prior threats of an accused to do violence to the person eventually slain are admissible as showing such malice and intent.

The State's reliance on those cases is misplaced. In *People v. Lion* two witnesses testified as to prior threats made by the accused against the decedent. (10 Ill. 2d 208, 217.) In *People v. Jayne* a number of witnesses testified that the accused had specifically threatened to kill the decedent in that case, and the court found the statements to be admissible, reasoning that "[p]rior threats of an accused to do violence to the person eventually slain have consistently been held admissible as showing malice and criminal intent." (*People v. Jayne* (1977), 52 Ill. App. 3d 990, 1007.) To hold admissible a threat made by an accused individual against the person actually killed is categorically different from saying that a general threat that is not specifically directed towards any one person is admissible to show malice and criminal intent. There is no indication that the statement at issue in the instant case meant that violence would be perpetrated on the person who was eventually slain.

The defendant's alleged statement was so general and

impersonal that it cannot reasonably be characterized as being directed towards anyone in particular.

The State also asserts that the case of *People v. Osborne* (1917), 278 Ill. 104, supports its position that the statement of defendant Lampkin should be admissible here. It does not. In *Osborne* a prosecution witness testified that the defendant had stated if an attempt was made to arrest him he would " '*** shoot every damned policeman as fast as they come down; every policeman in Peoria is afraid of me.' " (278 Ill. 104, 108.) When an officer attempted to arrest the defendant within the next two hours a gun was fired at the officer. The court ruled that admission of the statement was proper because it tended to show the intent with which the shot was fired. The defendant there threatened a clearly identifiable group of Peoria policemen who might attempt to arrest him, two hours before an arrest of the defendant was made in which the defendant did shoot at the arresting officer. The defendant there sufficiently identified the arresting officers who were the object of his threat. Such circumstances are a far cry from the situation at hand where defendant Lampkin allegedly made a general statement six years earlier about getting "white honky coppers" which may have been prompted by a police investigation into his alleged activities involving stolen cars and stolen auto parts.

The defendant's statement should have been excluded because it is irrelevant, it has little or no probative value, and is very likely to arouse prejudice or hostility on the part of the jury. See *People v. DeHoyos* (1976), 64 Ill. 2d 128; McCormick, Evidence sec. 185, at 438-39 (2d ed. 1972).

In *People v. Wilson* (1948), 400 Ill. 603, the defendant was charged with the unlawful use of high explosives. The entire State's case, as in the case at bar, was circumstantial. In the instant case, as in *Wilson*, no eyewitness testimony was introduced, and the State offered no direct evi-

dence. The prosecution in both cases relied upon inferences to be drawn from indirect evidence. In *Wilson*, the State was permitted to introduce evidence to show that 17 years prior to the occurrence the defendant had used explosives. In reversing, this court held:

> "[W]e do not think it proper to go to the extent of presenting evidence which discloses collateral facts which are remote and incapable of affording any reasonable presumption or inference as to the principal matter in dispute. It is true it is sometimes difficult to draw the line as to just when collateral facts afford sufficient inference as to the issues in dispute in order to be admissible, and when such collateral facts tend to divert the minds of the jurors from the point in issue and arouse their prejudice. *Especially is this true where the case is entirely circumstantial, and where too much latitude is permitted pertaining to testimony which is remote it is likely to arouse passion and prejudice.* Without burdening the record with all of the details we are of the opinion the prosecution was given too much latitude in the examination of witnesses pertaining to events which occurred during the parties' married life and a number of years before the alleged offense." (Emphasis added.) 400 Ill. 603, 606.

The prejudicial effect of the defendant's alleged statement made six years earlier in the instant case outweighed any probative value the evidence might have had.

The testimony of Officer Kunz at trial also informed the jury that the defendant had previously been arrested. In describing the events of that day in June of 1973, Officer Kunz testified about his assignment to "conduct a follow-up and arrest investigation regarding a stripped automobile" at 7226 South Morgan Street in Chicago. Following a conversation at that address, Officer Kunz said that he had occasion to go to the police station at 61st and Racine Avenue in Chicago. Officer Kunz testified that while at the police station, he talked with the defendant Monroe Lampkin and "advised him of his constitutional rights." Officer Kunz testified further that the defendant was handcuffed

at the time and that the defendant was "arrested, processed and scheduled for a hearing."

This testimony that the defendant had previously been arrested should not have been admitted into evidence. This court has held it is fundamental that mere proof of an individual's arrest cannot be used against that individual in a criminal case since the evidence of an arrest would prejudice the defendant in the eyes of the jurors. (*People v. Bennett* (1953), 413 Ill. 601.) The defendant is entitled to a jury that is not prejudiced against him because of a prior arrest. The court spoke to the need for the jury's impartial disposition in *People v. Gregory* (1961), 22 Ill. 2d 601, where, in ruling that evidence of other crimes unrelated to the crime charged must be deleted from a statement or confession, it said:

> "Under our concepts of a fair and impartial criminal trial, it is elementary that a defendant, no matter how reprehensible his crime or how black his history of past misdeeds, is entitled to have his guilt or innocence determined solely with reference to the crime with which he is charged. Accordingly, it is well settled that evidence of other offenses unrelated to the crime for which a defendant is on trial is incompetent. And where such irrelevant material is contained in an otherwise competent statement or confession, it must be deleted before the statement or confession is read to the jury, unless to do so would seriously impair its evidentiary value. (*People v. Oden* [(1960)], 20 Ill. 2d 470; *People v. Donaldson* [(1956)], 8 Ill. 2d 510; *People v. Lane* [(1921)], 300 Ill. 422.) As a corollary to this rule, we have pointed out that the duty of the State's Attorney to safeguard the rights of all the people extends to one accused of a crime, and have held that the failure of a prosecutor to see to the deletion of prejudicial and improper matters from a statement or confession is a violation of that duty. *People v. Oden* [(1960)], 20 Ill. 2d 470." (22 Ill. 2d 601, 603-04.)

As a result of the introduction of this evidence, we cannot say that the jury considering the defendant's fate in the instant case was an impartial one. For all of the reasons we

have discussed, the alleged threat should not have been admitted, and we find that such an admission constitutes reversible error.

In view of our determination that admission of this highly prejudicial and inflammatory testimony constitutes reversible error, it is unnecessary for us to resolve the other issues raised in this appeal. We do, however, feel it is necessary to point out a few of the other troubling dimensions of this case.

Crucial to the prosecution's presentation of the case was the identification of a trail of blood leading from the scene of the killings to a concrete abutment (overpass Route 17) and up an embankment. In the grass on the embankment several blood-stained expended .38-caliber cartridges were found. The prosecution theorized that it was the defendant who had left the trail of blood from the automobile to the concrete abutment and up the embankment.

At trial, the defendant denied being near the abutment or embankment. Because no one identified the defendant as being in either place, the circumstantial evidence presented to the jury was crucial as the jury attempted to assess the defendant's credibility.

The State called Ms. Debra Verges, a seriologist with the Illinois Department of Law Enforcement. She testified that the blood on the abutment and the blood on the shells was Type O, and the blood of the defendant was also Type O.

The jury was never told that the blood on the concrete abutment and the blood on the shells and the defendant's whole blood had each been analyzed by forensic scientist Parmod Dhawan of the Illinois Department of Law Enforcement, whose analysis excluded the defendant from any possibility of being the one whose blood was on the abutment or the shells. Nor was the jury informed of the professional conclusions of Mark Stolorow, seriology coor-

dinator for the Illinois Department of Law Enforcement. During his testimony at the post-conviction hearing, Mr. Stolorow expressed doubts about the accuracy of Dhawan's report. However, Stolorow agreed that if Dhawan's report was accurate with respect to the phenotyping of David Lampkin's blood, and the defendant's blood, and the blood on the shells and cartridges (there was nothing contradicting those shell and cartridge findings), and the blood on the concrete abutment (which Stolorow corroborated), then the defendant could not have been the source of either the blood on the concrete or the blood on the shells. Furthermore, Stolorow acknowledged that under such circumstances nothing excluded David Lampkin, defendant's brother who was shot and killed at the scene, from being the donor of either the blood on the concrete and/or the blood on the shells found on the embankment.

At the post-conviction hearing, defense counsel testified with respect to the exculpatory report reflecting an analysis that, if accurate, demonstrated that the incriminating blood on the shells and casings could not have been the defendant's.

Defense counsel stated that he did not have an independent recollection of the document but that another document stood out in his mind that indicated Dhawan made some error. This other document was identified by defense counsel as a memorandum signed by Gary J. Bombard, an assistant laboratory supervisor to Ms. Sally Dillon, the laboratory supervisor.

According to defense counsel, he concluded that based upon the memo from Mr. Bombard the competence of Dhawan's testing "probably was lousy." While Bombard's memorandum does raise allegations as to Dhawan's competency, defense counsel testified that the memorandum did not relate to any tests that concerned Monroe Lampkin.

Defense counsel testified at the post-conviction hearing that he was told by the Department of Law Enforcement

shortly prior to trial that Dhawan was unavailable or that he left the Department. He testified further that he made no attempt to locate Dhawan because, according to defense counsel, there was never enough time.

When asked why he did not make any attempt to corroborate or contradict what was said in the memo about Dhawan, defense counsel responded:

"I wanted to, but my recollection is that this document was tendered to me late and I was concerned in view of the fact that *there had been no opportunity to as far as I was concerned to interview this witness as well as numerous other witnesses. There simply wasn't enough time allowed in this case.*"

Defense counsel had a copy of Dhawan's report, but he did not use the report at the trial. The State asserts that it is immaterial that Dhawan's report was not introduced at trial. While the reliability and credibility of Dhawan's work was attacked by the State at the post-conviction hearing, it is one thing to impeach favorable testimony, as the State asserts would have happened had the report been introduced at trial, and quite another never to have a report introduced which might exonerate the defendant.

Counsel made a motion for a continuance on September 19, 1979, and renewed that motion on September 24, 1979, prior to trial, and informed the trial court that he was not ready to proceed. The court denied the motion for a continuance. Counsel then filed a motion for injunctive relief in the United States District Court which was denied on abstention grounds. A second motion for a continuance by defense counsel was denied.

After the first day of *voir dire*, defense counsel was stricken with chest pains and admitted to the hospital on an emergency basis, where he was diagnosed as having a "cardiovascular disturbance." Defense counsel's testimony at the post-conviction proceedings does not show if he was released later that day, but there is no indication that the next day of *voir dire* was delayed whatsoever because of

counsel's health. Despite the fact defense counsel took extraordinary steps to gain a continuance and then suffered a heart attack following the first day of *voir dire*, he went on with the *voir dire* and on with the trial.

While the defendant asserts he did not receive effective assistance of counsel at trial, we need not resolve that issue in view of our holding today that the admission of Officer Kunz' testimony concerning the alleged threat made by the defendant constitutes reversible error.

In sum, we reverse the judgment of the circuit court of Kankakee County, vacate the sentence of death, and remand the cause to the circuit court of Kankakee County for a new trial. Further proceedings in the circuit court are to be conducted in a manner consistent with this opinion.

*Reversed and remanded.*

CHIEF JUSTICE RYAN, dissenting:

The opinion of this court bases the reversal of the defendant's conviction on the admission into evidence of a statement made by the defendant almost six years before the murders involved in this case: "You white honky coppers are [expletive deleted] with us now, and we will get you later." Under the case law of this State as noted below, the statement was admissible. The prosecution need not, and indeed should not, pull its punches and not present evidence it has simply because it may be damaging to the defendant's cause. I must therefore dissent.

A previously made threat, while it may not be general in nature, need not be directed at the person subsequently killed to be admissible in evidence. A threat is admissible if the person killed is a member of a class against whom the threat was made.

In *People v. Scott* (1918), 284 Ill. 465, this court set forth the general proposition that a threat to commit a crime for which the accused is being tried is admissible to show intent if such threat imparts a hostile purpose on the part of the accused and the deceased is one who is encom-

passed within the scope of the threat. Trooper McCarter, a white police officer, clearly falls within the class of people encompassed by defendant's threat against "white honky coppers." In *People v. Osborne* (1917), 278 Ill. 104, 108, defendant made a similar threat when he said, "*** I will shoot every damned policeman as fast as they come down ***." The defendant was later convicted for attempting to shoot a police officer and claimed that testimony as to the above statement should not have been admitted at trial. In affirming his conviction, this court held the testimony admissible to show intent. (See *Palmer v. People* (1891), 138 Ill. 356, 367; see also *People v. Lion* (1957), 10 Ill. 2d 208; *Painter v. People* (1893), 147 Ill. 444; but *cf. Bird v. United States* (1901), 180 U.S. 356, 45 L. Ed. 570, 21 S. Ct. 403, and *People v. Sorrells* (1920), 293 Ill. 591 (where threats, which were of a general nature and the person injured was not within the scope of the threats, were held to be not admissible).) In *Painter v. People* (1893), 147 Ill. 444, this court held that the lapse of time intervening between a threat made by the accused and the subsequent killing went only to the weight to be given to the evidence of the threat, and not to the admissibility thereof. In *People v. Griswold* (1950), 405 Ill. 533, this court held that a similar objection went only to the credibility of the witness who was testifying as to the prior threat. Although the time period involved in the matter at hand is somewhat longer, the reasoning of *Painter* and *Griswold* is still applicable, and the evidence of defendant's prior statement was properly admitted at the guilt phase of the trial. The jury was entitled to decide what weight to give to the evidence.

The majority opinion complains that the prosecution commented on this threat in the opening statement and the closing remarks. The prosecutor, in the opening statement, had the right to inform the jury what the evidence would show and, in the closing remarks, had the right to comment on the evidence properly introduced and to draw

legitimate inferences therefrom. The fact that the threat that the defendant had previously made to "get" white police officers later did not help his cause is no reason to require the prosecutor to refrain from mentioning or commenting on this evidence. Furthermore, my examination of the record discloses that not a single objection was made to these comments during the opening statement, the closing argument, or rebuttal. Also, I find nothing in the record to indicate that these issues were raised in a written post-trial motion, or that an oral motion was made raising these issues. The question of the propriety of the prosecutor's comments has not been preserved for appeal.

To preserve an issue for appeal, an objection must be raised at trial *and* in a post-trial motion. (*People v. Lucas* (1981), 88 Ill. 2d 245; *People v. Jackson* (1981), 84 Ill. 2d 350.) The reason for this requirement is judicial economy and fairness to the parties.

> "Timely and specific objection at trial affords the court an opportunity to prevent most errors by sustaining the objection or instructing the jury to disregard the answer or remark. [Citations.] And specific references in post-trial motions to the reasons why a trial judge's actions or rulings were wrong enables him to reconsider their propriety in a less pressured environment. If an egregious error has actually occurred, the judge can order a new trial, thus avoiding the delay and expense of appellate review." (*People v. Jackson* (1981), 84 Ill. 2d 350, 359.)

See *People v. Free* (1983), 94 Ill. 2d 378, 425; *People v. Pearson* (1981), 88 Ill. 2d 210; *People v. Lykins* (1979), 77 Ill. 2d 35; *People v. Precup* (1978), 73 Ill. 2d 7; *People v. Pickett* (1973), 54 Ill. 2d 280.

A defendant should not be permitted to have "two bites at the apple." The waiver rule encourages timely objections to error at trial. If it is not applied, a defendant may intentionally permit erroneous comment to be made solely for the purpose of creating error to support him on appeal if the verdict is against him. He would thus be rewarded

for his failing to act and permitting error. *People v. Adkisson* (1980), 83 Ill. 2d 1.

My colleagues also see something sinister in the manner in which the evidence of this threat was presented, stating: "At trial the prosecution waited until near the close of its case in chief to call Officer Kunz to the stand. The defendant argues that this was done to place greater emphasis on the officer's testimony." My only response is, What is wrong with that? Are we now going to compel the prosecutor to present his evidence in a manner that will minimize its impact? Also, the criticism of Officer Kunz' testimony in the opinion following the above-quoted statement does not go to its admissibility, but only to the weight to be given this testimony, which is not for us to determine.

The opinion also highlights the fact that the prosecutor did not point out to the jury the factors that may detract from the weight to be given to the threat. This is no reason to fault the prosecutor. This trial, as are all trials, was an adversary proceeding. The defendant was represented by an attorney who could have commented on the weakness of this testimony if he felt that it was necessary to do so. The prosecutor was certainly not required to do so.

I do not understand the majority's reliance on *People v. Wilson* (1948), 400 Ill. 603. That case held that it was error to introduce evidence of similar conduct that occurred 17 years before the crime. In our case, we are not talking about 17 years, and we are not talking about similar conduct. We are here talking about a threat that the defendant made to kill white police officers, and the decedent was a white police officer. The previous threat is evidence of intent and motive. In my opinion, *Wilson* is irrelevant.

The majority is also troubled by the fact that the jury was never told about the report of a blood analysis made by Parmod Dhawan which, the defendant contends, would have benefited his defense. The defendant's attorney had a copy of this report but chose not to use it at trial. The

prosecutor has neither the duty, nor the right, to conduct the defendant's defense, nor to dictate his counsel's trial strategy.

Since a new trial has been ordered by the majority opinion, any discussion of the failure to grant a continuance is unnecessary. I wish to point out, however, that the court had originally set this case for trial on July 23, 1979. On July 5, 1979, defense counsel moved for a continuance and requested a new trial date of September 17, 1979. For reasons of convenience, the date of September 24, 1979, was agreed to by counsel. Although the defense counsel had over five months to prepare for trial on a date of his choosing, on September 19, 1979, and again on September 24, 1979 (the trial date), counsel sought continuances. Both motions were denied. The trial judge stated that taking into account the difficulty of the case and the length of time allowed for preparation, he believed the defendant had been given adequate time to prepare for trial.

In *People v. Lott* (1977), 66 Ill. 2d 290, this court stated that a motion for continuance lies within the sound discretion of the trial court but that a refusal to grant a continuance which deprives the accused of a reasonable time to prepare for trial is reversible error. However, in *Lott* the defendant was denied a continuance which was sought after the State produced a surprise witness. Defendant sought time to discover additional information in an attempt to impeach this witness. This court determined that this denial of defendant's motion for a continuance was prejudicial. This is simply not the case presented here.

> "There is no mechanical test, statutory or other, for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend. The circumstances of each case must be weighed, particularly the reasons presented to the trial judge at the time the request is denied." (*People v. Lott* (1977), 66 Ill. 2d 290, 297.)

I feel that the trial judge weighed the facts involved in this situation and did not abuse his discretion in denying defendant's motion for a continuance. See also *People v. King* (1977), 66 Ill. 2d 551.

The record is not clear as to the nature of defense counsel's health problem which arose during the first day of *voir dire* examination. He, apparently, was admitted to the hospital and was released either the same day or the next morning. In any event, his ailment obviously was not serious. The defendant did not contend that a continuance was sought after the seizure or that the court forced counsel to proceed in spite of his ailment. Nor is there any showing or contention that counsel's performance as an attorney was impaired as a result of this incident. This discussion of counsel's seizure in the majority opinion is totally irrelevant.

For the reasons stated, I respectfully dissent.

UNDERWOOD and MORAN, JJ., join in this dissent.