NOTICE
Decision filed 05/14/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241334-U

NO. 5-24-1334

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 23-CF-1713 |
| | ) | |
| LAURA J. NASH, | ) | Honorable |
| | ) | Rodney S. Forbes, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CLARKE delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where there is no issue of arguable merit that could reasonably lead to a reversal or modification of the judgment of conviction, this court grants the defendant's appointed appellate counsel leave to withdraw and affirms the judgment of conviction.

¶ 2    The defendant, Laura J. Nash, appeals from her conviction and sentence for possession of methamphetamine. Her attorney, the Office of the State Appellate Defender (OSAD), has concluded that this appeal has no arguable merit. Accordingly, OSAD has filed a motion for leave to withdraw as counsel, along with a supporting brief, pursuant to *Anders v. California*, 386 U.S. 738 (1967). The defendant has filed a response. Agreeing with OSAD's assessment of this case, this court grants OSAD leave to withdraw and affirms the circuit court's judgment of conviction.

1

¶ 3                                I. BACKGROUND

¶ 4     The defendant was charged with several felony counts. These felony counts included, *inter alia*, three counts involving the possession of firearms and one count of possession of 400 or more grams but less than 900 grams of a substance containing methamphetamine. This last offense was a Class X felony punishable by imprisonment for a term between 8 and 40 years. See 720 ILCS 646/60(a), (b)(5) (West 2022). The trial court appointed trial counsel for the defendant.

¶ 5     A jury trial was set for October 21, 2024. On that day, just prior to *voir dire*, the State moved to dismiss all the counts against the defendant, except for the count charging her with possession of 400 or more grams but less than 900 grams of a substance containing methamphetamine. Without objection, the trial court granted the motion to dismiss. The cause was called for trial on the remaining count. At trial, the defendant's defense was that she did not constructively possess the methamphetamine-containing substance.

¶ 6     During the *voir dire* stage of the trial, the trial court instructed the veniremembers about four "vital principles of law and procedure." The judge stated:

> "One, that the defendant is presumed to be innocent of the charges against her. Two, that a defendant cannot be found guilty as to that charge unless the [S]tate has proven her guilty beyond a reasonable doubt as to that charge. Three, that the defendant is not required to offer any evidence on her own behalf. And, four, that the defendant is not required to testify, and that if the defendant elects not to testify, that fact alone cannot be held against her."

At that point, the judge proceeded to ask all 28 veniremembers, in a group, questions about these four principles. "First," the court asked the 28 veniremembers, "do you understand and accept that the defendant is proven [*sic*] innocent of the charges against her?" In the trial transcript, there is

2

no "*sic*" between the words "proven" and "innocent. Therefore, it cannot be known with certainty whether the judge made a mistake in saying "proven innocent" instead of "presumed innocent" or whether the court reporter made an error in transcription. The judge sought an answer from each one of the 28 veniremembers, calling them individually, by name, and all 28, individually, responded in the affirmative, indicating their understanding and acceptance of the stated principle. The judge used this same method of inquiry in regard to each of the remaining three principles. He correctly stated each of those three principles. All 28 veniremembers indicated their understanding and acceptance of each principle.

¶ 7    Eventually, the trial court allowed the parties to ask questions of the veniremembers during *voir dire*. For this portion of the *voir dire*, the veniremembers were divided into two panels, and the parties questioned them one panel at a time. The defendant's trial counsel, in the midst of her own questioning of the first panel, stated as follows:

> "[D]o you remember when the Court asked you all about those four principles, those four legal principles? The way that the Court asked them of you is the way the rules say that he's supposed to, but one of the problems with that is, it doesn't really give you much of a chance to understand what you've agreed to do, so I want to talk to you about one area of the law in particular.
>
> Do you remember when the Court asked you if you could agree that the defendant is presumed innocent? We all remember that? And each one of you said 'yes.' But I want to give you a better chance to understand what the law says about it. The law tells us that the defendant is presumed innocent of the charges against her. This presumption remains with her throughout every stage in the trial and

3

during your deliberations. It is not overcome unless from all the evidence in the

case, you are convinced beyond a reasonable doubt that she is guilty.

So now that you've had a chance to hear a little bit more about the law, I

want to make sure that you all still feel like you can follow it."

Trial counsel then asked the first panel of veniremembers whether they could "truly presume that

the defendant is innocent," and she called them individually, by name, for an answer. One by one,

each veniremember in the first panel answered, "Yes."

¶ 8    To the second panel of veniremembers, trial counsel repeated her statement that the

defendant is presumed innocent, that this presumption remains with her throughout the trial, etc.

Trial counsel then asked the second panel of veniremembers whether they had "any reservations"

about following these rules regarding the presumption of innocence, and she called the

veniremembers individually, by name, for an answer. One by one, each veniremember in the

second panel answered, "No."

¶ 9    During the evidentiary portion of the trial, the State called five witnesses. Two of those

witnesses were Jacob Stewart and Jeffrey Hockaday, both of whom were detectives with the

Decatur Police Department. Their combined testimonies produced a description of events that were

preliminary to the defendant's arrest.

¶ 10    The combined testimonies of detectives Stewart and Hockaday showed that in early

November 2023, agents of the federal Department of Homeland Security (DHS) contacted Stewart

and Hockaday. The DHS agents informed Stewart and Hockaday of their interception of two

packages that contained suspected drugs and that the packages had been mailed to two different

Decatur addresses. Acting on this information, the police obtained anticipatory search warrants for

those two addresses. Of the two packages, the one relevant to the instant case was addressed to

Michelle Thomas at 1819 North Morgan Street. At Decatur police headquarters, DHS agents and Decatur police officers placed a GPS tracking device, supplied by DHS, inside the relevant package. They also attached another device to the relevant package, which was supposed to emit a signal to alert them when the package was opened.

¶ 11    The testimonies of Stewart and Hockaday further showed that on the morning of November 8, 2023, another Decatur police detective delivered the package to the front porch of 1819 North Morgan Street. Decatur police officers surveilled the house, waiting for someone to take the package inside. Eventually, a man came out of the house, picked up the package, and went back inside. Approximately 30 minutes after the package was taken inside the house, a man arrived at the house and went inside. When the man left the house, he had a duffel bag. He rode a bicycle away from the house and out of the area. The police did not stop this man, for DHS agents had told them that the package had not been opened, and the package was not moving, so they had no reason to stop him. The police continued to surveil the house. After 1 p.m., a man stepped out of the house. He was carrying a box, and he walked to a nearby garbage can in an alley. He returned to the house empty-handed. Police stopped the man. The box was in the garbage can, completely empty. It was then that Decatur police officers executed their anticipatory search warrant for 1819 North Morgan Street. Police did not find anything that was related to the package they had delivered to the house. The man who took the empty box from the house to the garbage can was identified as Leon Graves. Three other people were found inside the house—Mesha Gibbs, Oba Lee Beasley, and Lawrence D. Green. All four claimed to reside in the house, and all four denied seeing drugs in the house. Apparently, the GPS tracking device and the device intended to alert the police when the package was opened had both malfunctioned.

¶ 12   According to Stewart's and Hockaday's testimonies, the GPS tracking device began to function again the next day—November 9, 2023—in the early afternoon. The tracking device indicated that it was in the 1700 block of South Fairview Avenue. The device then began moving through Decatur, eventually stopping in the 1800 block of North Graceland Avenue. The police set up surveillance in that area. After 20 or 30 minutes, at approximately 2:20 p.m., a Chevrolet Malibu left the area, and the GPS tracking device began moving again. Inferring that the tracking device was inside the Malibu, police followed it. The Malibu eventually stopped at a motel, the USA Inn, on North Water Street in Decatur.

¶ 13   Detective Hockaday testified that once the Malibu arrived at the USA Inn, a police check of the license plates showed that the Malibu was registered to both the defendant and Sharice Smith, who was the defendant's daughter. It was the first time that the defendant's name had arisen in this particular investigation. Police searched the Malibu, which yielded a small amount of narcotics. Once narcotics were found in the Malibu, police began to prepare an application for a search warrant for the defendant's house. Hockaday went inside the USA Inn. There, he eventually spoke with the defendant in the hallway outside room 320, where the defendant was visiting Eric Currie.

¶ 14   Hockaday testified that he was wearing a body camera while at the USA Inn. He identified State's exhibit 4 as an edited version of the recordings made by his body camera at the motel. Without objection by the defendant, the recordings were published to the jury. The contents of the recordings were not inconsistent with Hockaday's testimony. The recordings showed, *inter alia*, that the police gained access to the Malibu's interior with the assistance of a towing service. They also showed that the police search of the Malibu yielded a small amount of suspected narcotics, a

6

pistol, a detachable magazine, a bullet, and an object wrapped in tape, which Hockaday said in the recording was the GPS tracking device.

¶ 15    Hockaday testified that after finishing his work at the USA Inn, he drove to the defendant's residence at 1806 North Graceland Avenue. He found that the police search of the residence was essentially complete.

¶ 16    Hockaday further testified that later that same day, he spoke with the defendant in an interview room at Decatur police headquarters. The defendant consented to an interview. Hockaday identified State's exhibit 5 as an audio-and-video recording of his interview with the defendant. Without objection by the defendant, the recording was admitted into evidence and published to the jury.

¶ 17    In the recorded interview, the defendant told Hockaday about a man named "Lonnie," whom she knew from "around town." She did not know Lonnie's last name. According to the defendant, Lonnie owed her money. At first, the defendant said that Lonnie owed her money because he had agreed to pay off his girlfriend's debt to the defendant. Later in the interview, the defendant said that Lonnie owed her money for the crack cocaine that she had sold to him. The defendant stated that she bought her crack cocaine from "a heavy-set guy." Continuing, the defendant told Hockaday that one day, Lonnie phoned the defendant at work and told her that he had robbed someone of crack cocaine and that he wanted her to hold the crack for him and "to help him get rid of it." Lonnie never stated from whom he had stolen the drugs. Sometime later, Lonnie brought a substantial package of drugs to the defendant's house. He told the defendant that they both would be able to pay off their debts, "eat good," and could "make thousands of more dollars." The defendant saw this prospect as a money-making opportunity, one that would spare her from having to "struggle." Subsequently, the defendant took the drugs to "the white guy" for an

7

identification of the exact nature of the drugs, and the white guy told her that the substance was "meth." The defendant told Hockaday that the only reason narcotics were found in her car was that she had used her car to transport the drugs to the white guy. At one point, in the middle of the interview, the defendant told Hockaday that she took "full responsibility." She did not specify for what she took full responsibility, and Hockaday did not ask her to specify. The defendant also offered to wear "a wire," assuring Hockaday that Lonnie would admit that the drugs were his own.

¶ 18    Brent Morey, another Decatur police detective, testified that on November 9, 2023, beginning at approximately 6:20 p.m., he and other Decatur police officers searched the residence at 1806 North Graceland Avenue, pursuant to a warrant. In the northwest corner bedroom, inside a backpack, Morey found certain documents that belonged to the defendant. Morey also searched a hallway linen closet near that bedroom. In the closet, he found a box wrapped in a gray plastic shopping bag. He handed the item to another detective, who removed the plastic bag. Morey stated that the box inside the plastic bag was "a USPS box substantially similar to one that we were dealing with at the onset of this investigation," though he did not recall whether the box was addressed to 1819 North Morgan Street. When the box was opened, it was found to contain "suspected methamphetamine."

¶ 19    Detective Morey wore a body camera during the police search of 1806 North Graceland Avenue. He identified State's exhibit 1 as an audio-and-video recording of the search, made with his body camera. Nothing in that recording was inconsistent with Morey's testimony.

¶ 20    Nicholas Errett, a Decatur police detective, testified that in the early evening of November 9, 2023, he participated in a search of the residence at 1806 North Graceland Avenue. Detective Errett's role was to photograph, collect, and document all evidence. From his own identifying markings, Errett identified State's exhibit 2 as the substance that Morey had seized. The substance,

when separated from its packaging, had a preliminary weight of 805.8 grams. Without objection, the substance was admitted into evidence and published to the jury. Errett also identified State's exhibit 3 as documents seized during the search. Without objection, the documents were admitted into evidence and published to the jury. State's exhibit 3 consisted of a Social Security card and an Illinois driver's license, each of which bore the name of the defendant.

¶ 21 Kristin Stiefvater testified that she had worked as a drug chemist at the Illinois State Police (ISP) Crime Lab for nearly 30 years. The parties stipulated that she was an expert in the field of drug chemistry. Stiefvater testified that she received the substance that was seized in this case. The substance itself weighed 802.2 grams. Using mass spectrometry, she examined the substance. Based on the results of that testing, Stiefvater formed an expert opinion that "the 802.2 grams of crystalline substance contained methamphetamine."

¶ 22 The defendant testified on her own behalf. She was the sole witness for the defense. She testified that in November 2023, she was 50 years old and resided at 1806 North Graceland Avenue. At times, the defendant's oldest daughter and her two children would stay at her house. The defendant had never been to 1819 North Morgan Street in Decatur, and she did not know anyone who lived there.

¶ 23 The defendant also testified that in early November 2023, she had known Lawrence Green, or Lonnie, for a month. She knew Lonnie as "just a neighborhood guy," through family and friends. On November 8, 2023, in the evening, Lonnie appeared at the defendant's house. His coming to her house was not unusual, for the defendant prepared and sold dinners to people, including him. On this occasion, though, Lonnie seemed very nervous.

¶ 24 The defendant testified that the next day—November 9, 2023—she worked from 5:30 a.m. to 1:30 p.m. After work, she returned home. Later in the afternoon, she drove to a motel, the USA

Inn, for a visit with her "significant other," Eric Currie, in room 320. Police appeared and told her that they had searched her car. When Detective Hockaday told her that police had found drugs in her car, she was "shocked and nervous" for she did not know that drugs were there. She had recently given rides in her car to Lonnie and to "two other people" who had purchased dinners from her. From the motel, she was taken to the jail.

¶ 25    The defendant further testified that at the jail, she told Hockaday that she wanted to speak to him. Hockaday told her that the police had searched her home and had found drugs in her linen closet. The defendant told Hockaday about Lonnie, and how he had come to her house unexpectedly, scared and sweating, with a duffel bag. The defendant testified that, during her police interview, she had lied to Hockaday when she stated that Lonnie had told her that he had a money-making opportunity and had asked her to hold something for him, and she also lied when she stated that she had agreed to do so. In fact, she and Lonnie had not agreed on any plan, the defendant testified. That entire scenario was a fabrication, she stated. In truth, the defendant did not know that there were drugs in her car, and she did not know that drugs were in her hallway linen closet. She did not allow Lonnie to store anything in her house. The defendant explained why she had told Hockaday that she knew about the drugs in the car and in the linen closet:

> "Because I was trying to get him to get Lonnie and help them to—whatever he needed because when I told him I didn't know, he didn't say anything. So I said, 'Okay. If I tell them I do know, maybe he'll help go get the person that this stuff belonged to because it's not mine.' I gave him my phone, told them everything that I wanted—that I knew that would help me, and I—it wouldn't. I said, 'Let me tell him something that he wanted to hear.' "

10

When the defendant told Hockaday that she took full responsibility, she meant that she took full responsibility for "being involved with having somebody to be in my car." At the time of that statement, she did not know about the drugs in her house. She volunteered to work as a confidential informant because she did not want to go to jail. "I wanted to find the person that done this, and it wasn't me." Lonnie did not owe the defendant money and neither did his girlfriend. During her trial testimony, the defendant did not explain how the GPS tracking device came to be in her Malibu, and she was not asked about the device.

¶ 26    The parties presented a stipulation. They stipulated that employees of the Macon County Probation Department would testify that Lawrence D. Green, born January 23, 1960, is known by the following aliases: "Lawrence Carey," "Larry Green," and "Lonnie."

¶ 27    After deliberations, the jury returned a verdict finding the defendant guilty of possession of methamphetamine. The trial court set a date for posttrial motions and sentencing and ordered the probation office to prepare a presentence investigation report (PSI).

¶ 28    The defendant filed a one-page motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. It raised just one claim—that the State's evidence was insufficient to establish her guilt.

¶ 29    The PSI included a criminal history for the defendant, which included a conviction for residential burglary, with a six-year prison sentence, in 1998. Her employment history showed that from August 2021 until her arrest for the instant offense in November 2023, she worked full-time as the head cook at a nursing home.

¶ 30    The trial court held a hearing on the defendant's posttrial motion. Neither party presented evidence. The court found that the State had proven the defendant guilty beyond a reasonable doubt, and it denied the defendant's motion.

11

¶ 31    Immediately, the court proceeded to sentencing. The parties did not present evidence in aggravation or mitigation. For her statement in allocution, the defendant stated that she had been caring for her grandson and for her two youngest children. She stated that she had made a "bad choice," which she regretted, and she asked for mercy. The State recommended a sentence of 10 years in prison, and defense counsel recommended 8 years, which was the minimum. The court found that the defendant was an older defendant, at age 51, that she had always been polite to the court, that she sincerely regretted her crime, that she had been to prison previously, but for a crime committed almost 20 years earlier, that she had a history of depression and alcohol abuse, and that before her instant arrest, she worked full-time and cared for her daughter and grandchildren. The court sentenced the defendant to imprisonment for 9 years, to be followed by mandatory supervised release for 18 months.

¶ 32    The defendant filed a timely motion to reconsider sentence, claiming only that her nine-year sentence was excessive. On December 5, 2024, the trial court held a hearing on the motion to reconsider sentence, at which no evidence was presented, and denied the motion. On the defendant's behalf, the circuit clerk filed a notice of appeal, thus perfecting the instant appeal. The trial court appointed OSAD to represent the defendant on appeal.

¶ 33    Most of the factual background necessary for a decision in this appeal has been presented. Additional facts will be presented as necessary to decide the potential issues raised by OSAD.

¶ 34                                II. ANALYSIS

¶ 35    This appeal is a direct appeal. In its *Anders* brief, OSAD raises six potential issues, and concludes that each is without arguable merit. This court agrees.

¶ 36    OSAD's first potential issue is whether the trial court erred by failing to properly question potential jurors about the four legal principles set forth in Illinois Supreme Court Rule 431(b) (eff.

12

July 1, 2012), and particularly about the defendant's presumption of innocence. Rule 431(b) requires the court to ask "each potential juror, individually or in a group," whether he or she "understands and accepts" four principles, namely:

"(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."

Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

However, this potential Rule 431(b) issue was not raised in the trial court. Therefore, it is forfeited on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must both make a trial objection and raise the issue in a written posttrial motion).

¶ 37 OSAD explores whether the potential Rule 431(b) issue may be considered as plain error, or whether it may be considered as part of an argument that trial counsel provided the defendant with ineffective assistance. OSAD concludes that neither argument would have merit. This court shares that view. Under the plain-error doctrine, a defendant's procedural default may be excused when an error is "clear or obvious" and (1) the evidence is "so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step of plain-error analysis is determining whether any error at all occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009).

13

¶ 38   Here, even if this court were to assume that the trial court committed an error when it questioned the veniremembers about the presumption of innocence, the evidence presented at the defendant's trial cannot reasonably be characterized as "closely balanced" under the first prong of plain-error analysis. As OSAD acknowledges, the methamphetamine found in the defendant's linen closet, combined with the defendant's confession to Detective Hockaday, provided "overwhelming proof" that the defendant was guilty of methamphetamine possession. As for the second prong of plain-error analysis, the alleged Rule 431(b) error is not so serious that it affected the fairness of the defendant's trial or challenged the integrity of the judicial process. Compliance with Rule 431(b) is not indispensable to a fair trial. *People v. Thompson*, 238 Ill. 2d 598, 614 (2010). If a defendant were, in fact, tried by a biased or prejudiced jury, such a situation "would certainly satisfy the second prong of plain-error review." *Id.* However, this record contains no indication that the instant jury was anything but fair and impartial.

¶ 39   OSAD also raises the possibility that the court's Rule 431(b) questioning of the veniremembers may be considered as part of a claim of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Both prongs of the *Strickland* test—deficiency and prejudice—must be shown to establish ineffective assistance, and the failure to establish either prong will be fatal to the defendant's claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). A court may dispose of an ineffective-assistance claim by proceeding directly to the prejudice prong, without addressing the performance prong. *Strickland*, 466 U.S. at 697; *People v. Hale*, 2013 IL 113140, ¶ 17.

14

¶ 40    After the court questioned the veniremembers on the four principles of Rule 431(b), trial counsel conducted her own questioning. Trial counsel correctly stated the four principles, including the principle that the defendant was presumed innocent, and counsel asked each veniremember about his or her understanding and acceptance of the presumption of innocence. Each veniremember answered trial counsel's questions in ways that indicated an understanding and acceptance of the presumption of innocence. Even if trial counsel committed an unprofessional error by not objecting to the trial court's alleged error in its Rule 431(b) questioning, counsel more than made up for that error in its own questioning of the veniremembers. As OSAD notes in its *Anders* brief, the defendant "cannot show the prejudice necessary to prove ineffective assistance of counsel since trial counsel remedied any error that may have occurred, and because the State's evidence was so strong." Prejudice, and therefore ineffective assistance, cannot be established.

¶ 41    This record supports a finding that all of the prospective jurors timely indicated that they both understood and accepted the principle that the defendant was presumed to be innocent of the charges against her.

¶ 42    OSAD's second potential issue is whether the defendant's trial counsel was ineffective for failing to object to the State's allegedly insufficient chain of custody of the methamphetamine in this case. A chain-of-custody issue was not raised in the trial court. Where a defendant fails to specifically object to the sufficiency of the chain of custody at trial, and no specific chain-of-custody challenge is raised in a posttrial motion, the claim is procedurally defaulted on appeal. *People v. Woods*, 214 Ill. 2d 455, 473 (2005). Here, that claim was procedurally defaulted. In its *Anders* brief, OSAD states that "[t]he only manner available to appellate counsel to raise this issue on appeal would be to assert ineffective assistance of trial counsel."

15

¶ 43 However, as this court noted above, to prevail on a claim of ineffective assistance of counsel, a defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In other words, "the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. In general, the standard of review for determining whether an individual's constitutional rights have been violated is *de novo*. *Hale*, 2013 IL 113140, ¶ 15 (applying *de novo* review to the question of whether defendant was deprived of his constitutional right to the effective assistance of counsel during plea negotiations with the State).

¶ 44 In *Woods*, our supreme court held that unless the defendant produces evidence of actual tampering, substitution, or contamination, a chain of custody is sufficiently complete if the State demonstrates "that reasonable measures were employed to protect evidence from the time that it was seized and that it was unlikely that the evidence has been altered." *Woods*, 214 Ill. 2d 467. It is not necessary to call as a trial witness every person who was in the chain of custody. *Id.*

¶ 45 Here, according to OSAD, "[t]he only gap in the chain of custody was caused by the State's failure to call Zeth Giles, a Decatur police department evidence custodian." However, as OSAD acknowledges, "[t]he State established that reasonable protective measures were employed to protect the evidence and that it was unlikely that the evidence had been tampered with between the time of seizure and forensic testing." Where the State presented a sufficiently complete chain of custody even without Giles's testimony, and the defendant did not produce evidence of actual tampering, substitution, or contamination, the defendant was not prejudiced by trial counsel's failure to object to the admission of the methamphetamine on chain-of-custody grounds. No meritorious argument can be raised under a theory of ineffective assistance of trial counsel.

16

¶ 46 OSAD's third potential issue is whether trial counsel was ineffective for failing to move to redact video footage presented to the jury concerning the possession of weapons by the defendant. As noted previously, a defendant cannot prevail on a claim of ineffective assistance of counsel unless he shows that counsel's allegedly deficient performance actually prejudiced the defense. *Strickland*, 466 U.S. at 687. Review is *de novo*. *Hale*, 2013 IL 113140, ¶ 15.

¶ 47 On the day that the defendant's trial began, just before *voir dire*, the State moved to dismiss all the counts facing the defendant, except for the count charging her with possession of 400 or more grams but less than 900 grams of methamphetamine. That was the only count on which she was brought to trial. Trial counsel had arranged for a witness to testify about the firearms-related counts, but in light of the dismissal of those counts, she did not have to call that witness. During the testimony of Detective Hockaday, the jury saw and heard a body-camera recording of Hockaday's search of the defendant's Chevrolet Malibu, and Hockaday's discovery of a pistol, a detachable magazine, and a bullet in that Malibu. This video was a part of State's exhibit 4. The jury also saw and heard video that included references to a pink handgun found at the defendant's house, and the defendant's stating that the gun in her house and in the Malibu belonged to other people, not to her. No live witnesses at the defendant's trial testified about guns.

¶ 48 Trial counsel did not seek a continuance to allow for the redaction or removal of all firearms-related material from the videos that were played for the jury. Such redaction or removal would certainly have been permitted in a trial where the sole count was for possession of methamphetamine. See *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983) (a defendant is entitled to have her guilt or innocence evaluated solely on the basis of the charged crime). However, even if trial counsel committed an unprofessional error in not seeking redaction of the firearms material from the videos, the defendant was not prejudiced by the error, for as OSAD states in its *Anders*

17

brief, "[t]he evidence presented on the charge of possession of methamphetamine was substantial." The methamphetamine was found by Detective Morey in the defendant's home, where she lived alone. It was found on an upper shelf in the defendant's hallway linen closet. In her trial testimony, the defendant stated, essentially, that she had no idea how methamphetamine got into her linen closet. The defendant made incriminating statements to Detective Hockaday during her recorded interview. In the interview, she said that "Lonnie" had brought the package of methamphetamine to her house and had told her that they both would be able to pay off their debts, "eat good," and could "make thousands of more dollars." During the recorded interview, the defendant also told Hockaday that she saw her involvement with the drugs as a money-making opportunity, one that could put an end to her "struggle." In her trial testimony, the defendant sought to explain away her incriminating statements to Hockaday by stating that she was trying to persuade Hockaday to find the actual owner of the drugs. This explanation was not credible, and the jury was entitled to reject it given the substantial evidence supporting the conviction.

¶ 49 Based on the strength of the State's evidence, the defendant could not establish that she was prejudiced by her trial counsel's failure to redact the firearms-related material from the videos. No meritorious issue can be raised that the defendant received ineffective assistance of counsel because of that failure.

¶ 50 OSAD's fourth potential issue is whether the defendant's fourth amendment rights were violated when police searched her Malibu without a warrant. The fourth amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. In general, the fourth amendment requires police to obtain a warrant before conducting a search. *California v. Carney*, 471 U.S. 386 (1985). However, there is an exception to the warrant requirement for

18

automobiles. *Carroll v. United States*, 267 U.S. 132, 153 (1925). Because automobiles are readily mobile, and because there is a reduced expectation of privacy in them, a car can be searched without a warrant so long as there is probable cause for the search. *Carney*, 471 U.S. at 392.

¶ 51 Here, as OSAD points out, "[t]he police had probable cause to believe their tracker and the methamphetamine in which they had placed the tracker was in the car they had followed. Therefore, the forced entry into the car they had followed, later determined to be owned by [the defendant], was lawful, and no warrant was required." There is no meritorious argument that the defendant's fourth amendment rights were violated when police searched her car without a warrant.

¶ 52 OSAD's fifth potential issue is whether the defendant was proven guilty beyond a reasonable doubt. A court of review will reverse a conviction only if, viewing the evidence in the light most favorable to the State, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact is responsible for determining the credibility of witnesses and resolving inconsistencies and conflicts in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). To convict the defendant of the count for which she was tried, the State had to prove that (1) she knowingly possessed methamphetamine, and (2) the weight of the substance containing the methamphetamine was 400 or more grams but less than 900 grams. 720 ILCS 646/60(a), (b)(5) (West 2022).

¶ 53 As OSAD acknowledges in its *Anders* brief, "[t]he State presented a strong case." A package of suspected methamphetamine was found in the linen closet of the defendant's home, where she lived alone, during the execution of an uncontested search warrant. A veteran ISP drug chemist provided her expert opinion that the substance in the package weighed 802.2 grams and contained methamphetamine. In addition, the defendant made numerous inculpatory statements

during a police interview with Detective Hockaday. Viewed in the light most favorable to the State, the jury was free to find the defendant guilty. No argument to the contrary would have merit.

¶ 54    OSAD's sixth potential issue is whether any arguable error can be raised with respect to the sentence imposed. Under the Illinois Constitution, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial court has broad discretionary powers in imposing a sentence, and its sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Such a determination must be case-specific, and it depends upon many factors, including "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Where an imposed sentence falls within the statutory limits, the sentence will not be overturned on appeal absent an abuse of discretion. *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.*

¶ 55    Here, the sentencing range for the defendant's crime was 8 to 40 years. See 720 ILCS 646/60(b)(5) (West 2022). The trial court imposed a nine-year sentence, one year above the minimum. As OSAD states in its *Anders* brief, "the record does not show that the court considered any improper factors or failed to consider any relevant factors." The court did not abuse its discretion in sentencing the defendant.

¶ 56    As previously mentioned, the defendant has filed with this court a response to OSAD's *Anders* motion to withdraw as counsel. In her response, the defendant states that there was "a video" made at the USA Inn that would have "exonerated" her, but her trial attorney failed to secure that video during discovery. Also, trial counsel "did absolutely nothing" to contact the

20

defendant's witnesses or otherwise fashion a defense. These claims are not supported by anything in the record on direct appeal. The claims cannot be raised or adjudicated in this direct appeal. They would be more appropriately presented in a petition for postconviction relief, with supporting affidavits attached, than in a response to an *Anders* motion. See 725 ILCS 5/122-1 *et seq.* (West 2024); *People v. Collins*, 202 Ill. 2d 59, 66-67 (2002).

¶ 57                                    III. CONCLUSION

¶ 58    None of OSAD's six potential issues has arguable merit. This court's own examination of the record on appeal does not reveal any issue that could reasonably lead to a reversal or modification of the judgment of conviction. Accordingly, this court grants OSAD leave to withdraw as the defendant's appellate counsel and affirms the judgment of conviction entered by the trial court.

¶ 59    Motion granted; judgment affirmed.